## UNITED STATES v. EILERT BREWING & BEVERAGE CO.

(District Court, N. D. Ohio, E. D. December 26, 1921.)

### No. 643.

1. **Intoxicating liquors ☞275—Evidence held to establish maintenance of common nuisance.**

    Evidence *held* to establish the allegation that defendant maintained a common nuisance on premises by the manufacture and sale of intoxicating liquor thereon, which rendered them subject to injunction and abatement, under National Prohibition Act, tit. 2, § 22.

2. **Intoxicating liquors ☞260—Common nuisance same for purposes of criminal prosecution and injunction suit.**

    What constitutes a common nuisance for the purpose of a criminal prosecution, under National Prohibition Act, tit. 2, § 21, also constitutes a common nuisance for the purpose of an injunction suit, under section 22.

3. **Intoxicating liquors ☞261—Single sale of liquor, with possession of other liquor on the premises, constitutes maintenance of common nuisance.**

    A single sale of intoxicating liquor on premises, accompanied by the unlawful possession of other liquor thereon, is sufficient to warrant the granting of an injunction under National Prohibition Act, tit. 2, § 22, for maintenance of a common nuisance.

In Equity. Suit by the United States against the Eilert Brewing & Beverage Company. Decree for complainant.

E. S. Wertz, U. S. Atty., of Cleveland, Ohio.
Reed, Meals, Orgill & Maschke, of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge. This bill of complaint is filed under favor of sections 21 and 22, title 2, Act of Congress approved October 28, 1919, known as the National Prohibition Act (41 Stat. 314). The relief sought is the abatement as a common nuisance of certain premises therein described, and enjoining the further use thereof for the illegal manufacture and sale of intoxicating liquors. The defendant, called herein the Eilert Company, has answered, denying generally all the allegations of illegal manufacture and sale. In the hearing before me, and on argument, no question has been raised or discussed, except these issues of fact.

[1] The premises in question, including the buildings, machinery, and equipment, were formerly owned and used by the Excelsior Brewing Company for the manufacture and sale of beer. After prohibition became legally effective, the Eilert Company acquired the same, and have since been, and were at the time the transactions under investigation took place, used ostensibly for the manufacture and sale of

cereal and other nonalcoholic beverages. The government's evidence shows that on May 14, 1921, two prohibition enforcement agents bought from the defendant's sales manager and its cashier and head bookkeeper four cases of beer, found by analysis, made the first week in June following, to have an alcoholic content of 1.25 per cent. by volume. Three cases were taken from the defendant's bottling room from a large stack of similar cases. The purchase and sale was transacted at defendant's office and place of business with its sales manager, the money was paid to and received by its cashier and head bookkeeper, and sales memos made out by him and placed in a special wallet in the office safe. The price paid therefor was the sum of $5 a case, whereas the customary price for nonalcoholic or near-beer, it is admitted, was only $1.50 a case.

This evidence further shows that on May 19 these same agents bought another case of beer, found upon analysis to contain an alcoholic content of 2.86 per cent. by volume. This sale was transacted at the same place, in the same manner, with the same persons, and at the same price. The witnesses, however, say that, when they went to defendant's bottling room and inquiry was made for beer, it was found that there was on hand less than a case, and therefore, at the direction of defendant's sales manager, its cashier went elsewhere in an automobile, returning in about five minutes with a full case of beer. Again, on May 25, these same agents bought two cases of beer, one found upon analysis to contain 2.86 per cent. of alcohol by volume, and the other 3.21 per cent. These purchases were likewise made at the same place, in the same manner, of the same persons, and at the same price, and an employee of defendant was sent by its sales manager in an automobile therefor, and returned with the cases within a period of six or seven minutes. Again, on June 11, the same witnesses bought another case of beer, found upon analysis to contain an alcoholic content of 2.58 per cent. by volume. This sale was also transacted at the same place, in the same manner, with the same persons, and at the same price, and again an employee of defendant was sent by its sales manager after the same in an automobile, returning within a short time with the beer. On June 14 defendant's premises were seized by federal prohibition officers, and several samples of its product were taken at random from a large number of bottles in its bottling room, and three of them were at once analyzed. Of these, one showed an alcoholic content by volume of 51 per cent., and two an alcoholic content by volume of 71 per cent.

The witnesses making these purchases testify to numerous conversations characterizing the transactions then in progress. They say that they asked for real beer; that defendant's sales manager, its cashier and head bookkeeper, and its president were present on some, if not all, of the occasions, and knew and understood what the witnesses desired; and that defendant was selling alcoholic and not near-beer, and also that the beer thus sold was manufactured by defendant at its place of business, and was being thus manufactured and sold along with the nonalcoholic or near-beer. It appears that in the process of manufacturing near-beer, alcoholic beer is first produced, and later the alcohol is extracted therefrom, until the remaining alcoholic con-

tent is reduced to the limit permitted by law. The chemists say that a variation of 10 points is a sufficient allowance for errors in an ordinary chemical analysis; that is to say, that an alcoholic content ranging from 45 to 55 would not evidence an intention to produce and sell beer containing more than 50 per cent. of alcohol by volume.

It is the government's contention that defendant illegally and surreptitiously, under cover of its permit to manufacture and sell cereal beverages, near-beer, and other nonalcoholic drinks, was manufacturing and selling some part of its product of a higher alcoholic content, charging therefor a price of $3.50 a case higher than the customary price for the lawful beverages. Defendant admits that the four cases sold on May 14 were manufactured and sold at its plant, and were selected and delivered from an assortment of similar cases in its bottling plant. All other testimony incriminating defendant's president and sales manager is denied by them, but Fred J. Haller, its cashier and bookkeeper, admits that the sales made May 19, 25, and June 11 were of alcoholic beer. In explanation, it is urged that the high alcoholic content of the first four cases is due to the fact that they had not been pasteurized before the sale, and that between the sale and the first week in June, when they were analyzed, the alcoholic content might have been increased by fermentation. As to the sales made May 19, June 15, and June 11, the explanation urged is that this beer had been bought by Jacob Haller, defendant's brewmaster and vice president, from the Excelsior Brewing Company before the country had gone dry, and had been stored by him in the cellar of his house, a few hundred yards distant from defendant's plant, for his personal use, and that, he having left for Europe in April and remaining absent until August following, his son Fred J. Haller, its cashier and bookkeeper, wrongfully and illegally assumed to sell these cases from that stock.

Upon a study of the evidence, I am firmly convinced that the government's case is fully made out, and that these denials and explanations are not true. On all four occasions defendant's sales manager was in active charge of the transaction. Two sales slips were found at the time of the search and seizure in defendant's office, in the receptacle where the government's witnesses testify they had seen them placed. These show sales at $5 a case. The persons who were sent after the cases sold on May 25 and June 11 were not called as witnesses, and do not testify, and their absence is unexplained. One was present while the testimony was being taken. Even more convincing are the markings on the bottles and the cases, all of which I have examined. The four cases sold May 14 are mostly in plain bottles without labels, and one in a case labeled "Excelsior Brewing Co.," and the other three are labeled "Eilert Co." The case sold May 19 contains mostly plain bottles, some with the label "Pilsener" and "Home Brewing Co." blown in the bottles, and with the label "Excelsior Brewing Co." on the case. The two cases sold May 25 are mostly plain bottles, but contain thereon the Golden Seal label of defendant and are in a case marked "Eilert Co." The case sold June 11 contains bottles with the defendant's name blown in the glass, and are in a case labeled with defendant's name. These physical facts conclusively disprove the truth of the ex-

planations offered by defendant's witnesses, are consistent only with the statements of the government's witnesses, and fully sustain their testimony.

[2, 3] My finding on the issues of fact is that the defendant during the period in question was using the premises described in the bill for the illegal manufacture and sale of intoxicating liquors in violation of the National Prohibition Act. In criminal prosecutions for maintaining a common nuisance, under section 21 of the act, a single sale of intoxicating liquor, accompanied by the unlawful possession of other liquor, has been held sufficient by three Circuit Courts of Appeals to sustain a conviction. See Young v. U. S. (9 C. C. A.) 272 Fed. 967; Wiggins v. U. S. (2 C. C. A.) 272 Fed. 41; Gray v. U. S. (6 C. C. A., decided November 8, 1921) 276 Fed. 395. The definition of a common nuisance for which one may be prosecuted criminally, and a common nuisance which may be made the basis of an action in equity by injunction, is precisely the same. If the language of the act is to be given its ordinary meaning, that which constitutes a common nuisance for the purpose of a criminal prosecution will also constitute a common nuisance sufficient to support any action in equity. The language of the act suggests no reason why the public authorities may not resort to either or both remedies.

I have not overlooked U. S. v. Cohen (D. C.) 268 Fed. 420. In that case District Judge Faris expresses the opinion that a common nuisance, such as will support an action in equity, requires a more or less continuous violation of law, and that, if a single violation only is proved, the action at law by criminal prosecution may be adequate, and that equity may not take jurisdiction. This view it does not seem to me is sustainable, in the light of the three Circuit Court of Appeals decisions above cited and of the explicit language of sections 22 and 23, defining a common nuisance and giving the remedy both by indictment and by bill in equity. However, if such were the law, the evidence in this case shows a continuous violation sufficient under Judge Faris' view to sustain a bill in equity. Furthermore, the view that the remedy by bill in equity may not be resorted to for a first violation because the remedy at law by criminal prosecution is adequate is, it seems to me, plainly in conflict both with the holding and the reasoning in Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205. The reasons why a criminal prosecution is not adequate, and why the equitable remedy by injunction may be resorted to, are set forth with convincing clearness at 123 U. S. 672, 673, 8 Sup. Ct. 273, 31 L. Ed. 205, in that opinion.

Plaintiff is entitled to the relief prayed for. A decree will be entered enjoining the defendant, its officers and employees, from manufacturing or selling intoxicating liquor as defined in the National Prohibition Act on or from the premises described in the bill, and that the common nuisance heretofore maintained on said premises shall be abated. The decree will further order that neither the defendant nor any other person shall, for a period of one year from the date hereof, occupy or use said premises or any part thereof for the manufacture or sale, not only of intoxicating liquors, but of near-beer, cereal or other beverages, or liquid compounds or preparations requiring or

developing at any time in the course of their manufacture or preparation for sale any alcoholic content. Under section 23, the use of the premises for any purpose might be forbidden, but an injunction limited as above provided seems to me to be broad enough to answer fully all the requirements of the law and of the situation.