JAMES et al. v. STATE ex rel. LOSER, Attorney-General.—145 S. W. (2d) 1026.

Middle Section. August 17, 1940.

Petition for Certiorari denied by Supreme Court, December 14, 1940.

454

J. N. Daniel, Phil Ottarson, Jr., Joe Brown Cummings, and Albert Williams, all of Nashville, for appellants.

Harry G. Nichol, of Nashville, for appellee.

JOSEPH HIGGINS, S. J. This is a petition filed in the relation of the Honorable J. Carlton Loser, Attorney General of the Tenth Judicial District of Tennessee, comprising the County of Davidson. It was filed by the Attorney General pursuant to the provisions of Code, sections 9324 to 9334 inclusive, these sections embodying what are generally known as the Nuisance Statutes of the State.

The defendants were Grace James and her husband, Bill James, and two employees, one of them bearing the name of William Bradley and the other that of John Moore. All the defendants are colored people.

It was alleged in the petition that a certain building located on Cedar Street in Nashville and bearing street numbers 1122 and 1124 was at the time of the filing of the petition, and was for some time previously, used for the purpose of conducting, maintaining, carrying on or engaging in the unlawful sale of intoxicating liquors; and the keeping, maintaining and conducting of a bawdy or assignation house, and that the manner and method of conducting said property amounted to a public nuisance as defined by Code, section 9324. One of the portions of the structure bore the name of Black Hawk Restaurant—the other parts being known as Grace Hotel.

It was charged specifically that neither of these two establishments had a license to retail liquor, but that notwithstanding this failure to procure license, the unlawful sale of whiskey had taken place on many occasions, as ascertained by a survey made by the Alcoholic Unit of the Department of Finance and Taxation.

It was further alleged that the hotel and restaurant were being operated as a bawdyhouse; that rooms were rented to persons not married and known not to be married for the purpose of assignation and adultery, and that many people congregated in the Black Hawk Restaurant and therefrom would retire to the rooms in the hotel for immoral purposes.

The petitioner further stated that on Sunday morning, January 7, 1940, police officers of the City discovered that assignation and bawdyhouse activities were conducted therein, and discovered a white woman in bed with a negro man; that on the premises drunks and disorderly persons foregathered, and that said premises were operated in defiance of the law; and it was charged that for the reasons and because of the facts stated a nuisance was being carried thereon, and that defendant Grace James was the owner of the premises; that Bill James was the manager thereof, and that the other two parties were employees rendering services at said Hotel.

There was prayer for process and for the issuance of a temporary writ of injunction against all the defendants, restraining them from the further continuance of the nuisances carried on upon the premises; that on a hearing an order of abatement be entered adjudging the place to be a nuisance, and that defendants be enjoined from engaging in or carrying on the structure and place as a nuisance, and that defendants be enjoined and forbidden to allow said nuisances maintained thereon; and for general relief.

This petition was filed on January 9, 1940.

Defendants James and wife answered, admitting that the latter was the owner of the premises and that Bill James was the general manager, and that the other two defendants held some position of employment in the hotel and restaurant management.

These defendants denied that the unlawful practices alleged in the petition were conducted, or that the premises were a nuisance. These two defendants denied all knowledge of the unlawful practices and connivances thereat, and denied that they consented or permitted the practices enumerated or designated averred to be carried on with their consent or permission.

With respect to the charge of dispensing of liquor from or the storage of whiskey upon the premises, these chief defenders declared that they had undertaken at all times to prevent any person from using any portion of the premises for selling or storing of liquor, and stated in particular that sometime prior to the filing of their answer, one Roy Cooper, a guest of the hotel, was suspected of dispensing

liquors. They further alleged that Cooper and wife had occupied a room on the premises for some three weeks when these respondents suspected that he was bringing liquor upon the premises, and that they notified the sheriff's office of this suspicion and told one of the sheriff's deputies that they would be glad to assist them in apprehending said Cooper; that Bill James at the request of the officer had had Cooper's room opened and searched but found no liquor, but numerous empty bottles therein; and that he, James, had requested them— that is Cooper and wife—to leave, which they did. This respondent stated that he did not know who had informed the Alcohol Tax Unit of these matters but presumed it was done at the time when he was engaged with the officers in the enforcement of the laws and in undertaking to apprehend the suspected law violator.

These respondents deny that their hotel or restaurant had been or was being used as a bawdyhouse, and denied that rooms were ever rented jointly to persons of the opposite sex not known to be married, and that they took every precaution to prevent their premises from being used for assignation or adulterous purposes, and that they had gone to the extent of nailing up the doorway to the hotel through which they thought it possible that persons might enter from the restaurant unobserved by the clerk.

Concerning the discovery of the white woman in a room with a negro man, they stated that they had left Bradley, the hotel clerk, in charge of the property and that he was to remain on duty until midnight, he being under strict orders not to permit women of questionable reputation, whether white or black, to go into the hotel, and that he (Bradley) assured Bill James that those instructions were being scrupulously observed; that on this occasion Bradley, contrary to instructions, left his duties temporarily and turned the keys over to John Moore who had no duties to perform inside the building; that respondents believed that by collusion with said John Moore the white woman was permitted to enter the hotel for lewd purposes, but that they had no reason to believe that such a thing could happen, for they would have preferred the building to be burned rather than be put to such uses; that the first knowledge of the bad conduct discovered on January 7, 1940, was a call to him at his residence, some half block away; that when he reached the hotel he ordered all rooms to be opened to the officers and did not require that the officers have a search warrant. Respondents admitted that a man by the name of Upshaw was with a woman, and likewise one Miller, but that respondents supposed that they were married and they had no way or ground of suspecting that these people were unmarried, and their supposition was that they were allowed to enter by collusion with John Moore; that they had forbidden women to enter the rooms in which men were registered alone, and they made every effort to see that this rule was observed.

They gave a detailed statement of the occasion when a negro was drunk and disorderly and their efforts to apprehend him. They reiterated their denial that either the hotel or the restaurant was being maintained in violation of law; and they denied that Bradley and Moore were maintaining such nuisances for the reason that immediately after the incident of January 7, 1940, these two were discharged, and that neither of them had any connection with the hotel or restaurant, and that it was the purpose of respondents never to re-employ them.

Bill James admitted that he had shortly after coming to Nashville been arrested and convicted for carrying on the numbers racket; that when he was released from prison he made public announcement that he would not again participate in the operations for which he had been convicted and that he had not done so.

They stated that in 1937 the property described in the petition had been bought by Grace James and the buildings had been erected and improved at considerable cost; that respondents had taken considerable pride in providing hotel accommodations for the negro population of the section, and that people of the city had recommended the Hotel Grace to people desiring a decent place for their chauffeurs and servants; and that they had endeavored to maintain a decent and orderly hotel. They stated that the operation of a hotel for negroes is attended with many difficulties, and that unremitting vigilance is required to prevent disreputable characters from using the hotel rooms especially for that purpose, and for that reason they had given strict orders that no women be allowed to go to the room of a man who registered alone and couples not known to be man and wife. Respondents further stated that notwithstanding their efforts it did occasionally happen that undesirable persons would ask to become guests and that respondents were quick to inform the police when they suspected that something wrong was about to happen, for the reason that the respondents knew the consequences to their business if they allowed white prostitutes upon their premises, and they believed that they had rendered a public service and had conducted a decent and orderly inn.

Bradley and Moore had not answered at the time of the hearing of the application for a temporary injunction. They however subsequently responded, declaring in their answers that they knew nothing of the incident mentioned as happening in the restaurant. Bradley admitted he was clerk and Moore stated that he was an outside man and had no inside duties to perform. They denied knowing anything about the sale of liquor on the premises. They admitted the allegation respecting the discovery of a white woman in a room with a colored man, but denied that Grace James or Bill James had any knowledge of the same, and that it was Moore who had let the woman into the hotel through a back door.

On January 15, 1940, the application of the relator for a temporary injunction, and for the appointment of a receiver, was heard upon oral testimony as prayed for in the petition and by agreement. His Honor embodied his conclusions of fact in a decree awarding the temporary writ of injunction and appointing a receiver.

His findings were, in substance, that the relator had failed to sustain his allegations respecting the maintenance of a nuisance of any kind upon that portion of the premises known as the Black Hawk Restaurant. The Court, however, found as a fact that the allegation of the petition as to the storing and selling of liquors in the Grace Hotel had been sustained and that the conducting, maintaining and engaging in such sale or storage constituted a nuisance. He further found that on January 7, 1940, lewd and immoral conduct occurred upon the premises of the Grace Hotel with the permission and connivance of defendants Bradley and Moore, employees of the other defendants, but without the knowledge or consent of Bill or Grace James; and that such conduct had amounted to the conducting or keeping or maintaining of a bawdy or assignation house. The Court further found that Bradley and Moore had been discharged on January 7, 1940, and were at present inmates of the City Work House. He further found that Grace James was the owner of the premises and that Bill James was the manager, and that Bradley and Moore were their employees on the premises. He proceeded to award a restraining order prohibiting the defendants by themselves or through their representatives from suffering or conducting or maintaining an assignation or bawdyhouse upon said premises known as the Grace Hotel. He thereupon proceeded to appoint a receiver and reserved all other matters until the hearing upon the application for a permanent injunction.

On the succeeding day or two after the action of the Judge upon the application for temporary injunction and receiver, respondents Bill and Grace James moved the Court for immediate hearing of the cause. The parties had previously entered into a stipulation that there be a final hearing on February 5, 1940, upon the oral testimony that had been heard by the Judge at the preliminary hearing, with further stipulation that if the witnesses had been again called they would testify that they would give the same testimony which they had given at the previous hearing. It was further stipulated that this, the last or final hearing, would be according to the forms of chancery. This hearing was concluded on February 6, 1940. The Court again decreed that the allegations touching the Black Hawk Restaurant were not sustained by the proof, but that the charges as to the selling of intoxicating liquors upon the hotel premises had been sustained by the proof, and that this unlawful selling and storage of liquors upon the premises constituted a nuisance. The Court again referred to the incidents of January 7, 1940, and referred to them as lascivious

and immoral conduct carried on with the permission and connivance of Bradley and Moore, employees, but without the knowledge or consent of Grace or Bill James.

The Court further found that Bill James did have actual knowledge of the sale and storage of intoxicants upon or from the hotel premises.

The Court further decreed that the temporary injunction that had been issued be made permanent. He proceeded to discharge the receiver and to tax up his fee of $50 against Grace and Bill James, and taxed this receiver's fee and the costs against all defendants.

All defendants excepted and were granted an appeal to this Court, but Bradley and Moore failed to perfect their appeal or at least are not here assigning errors.

This cause has been elaborately briefed and was ably argued orally. ▆▆ We shall dispose of the assignments of error in their order, prefacing our comments thereon with the assumption that the questions of fact which were developed and submitted to the court sitting as a chancellor at the first hearing were found and made the basis of the final decree, and that the decree rendered by his Honor was arrived at after a first-hand view of the witnesses. Notwithstanding the stipulation that the cause be and was heard by Judge Gilbert sitting as a chancellor, we are constrained by the rules prevailing in this State to attach great weight and importance to his conclusions of fact. A logical deduction from this rule of practice is that an appellant assailing those findings of fact is onerated with the burden of showing that the findings of the Court were erroneous. See Seward v. Garner, 19 Tenn. App., 440, 89 S. W. (2d), 770.

▆ The finding of the Court that intoxicating liquors had been sold or kept for sale in the Hotel Grace is vigorously assailed upon the ground that those findings are not supported by a preponderance of the evidence, and that the facts established by the evidence were not sufficient to constitute a public nuisance as contemplated by Code, section 9324. Our response is that the clear preponderance of the evidence is to the effect that for at least some six or seven weeks preceding and up to about the 25th day of December, 1939, one Roy Cooper, a guest of the hotel, did an extensive retail liquor business in and from his room in the building. In fact, this is most satisfactorily shown, the evidence being so cogent as would have warranted a conviction of Cooper of the crime of illegally selling liquor. In fact we think his conduct in that regard was notorious. Hence we overrule this first assignment of error.

▆▆ It is urged in the second specification of error that the Court had no warrant for holding that Bill James had actual knowledge of the sale and storage of intoxicating liquors upon the hotel premises. It is urged that this finding is not supported by a preponderance of the evidence. Leaving for the present the question as

to whether that finding has any particular bearing upon the final disposition of the case, our response is that this conclusion of the Court was warranted by the greater weight of the evidence when the testimony is critically examined, as it evidently was by the learned trial judge. Supplementing this finding is the well founded presumption that the owner, or at least the general manager of the property, is presumed to have knowledge of criminal acts repeatedly committed upon the premises in his charge. 46 C. J., page 787.

In the third assignment complaint is made that the Court was not warranted in perpetually restraining and enjoining appellants and their employees from storing and selling intoxicating liquors upon the hotel premises. The chief criticism of this portion of the decree is that the proof had failed to show that at the time the suit was commenced the premises were being used for such unlawful purposes, but that on the contrary the premises were not being so used at the time. This question has given us much concern. We are not unmindful of the observations made in the case of Black v. State, 130 Tenn., 529, 172 S. W., 281, to the effect that the remedies provided by Code section 9324 were not for the purpose of inflicting punishment for past offenses, but that the chief object was to abate nuisances in existence at the time of the filing of the bill and to prohibit their continuance. But we cannot refrain from the observation that the above restrictions upon the issuance of injunctions may provide the means of escaping the consequences of the long continued maintenance of a nuisance. We have expressed concurrence with the finding of the Court that Bill James was aware of the illegal sales of liquor upon the hotel premises and that those illegal sales extended over a period of six, seven or maybe eight weeks. It is true that no sales between December 25th and January 7, 1940, were shown, but one of the officers who was on the premises upon the latter date testified that he found some empty bottles in a room. So that we are confronted with the question as to whether or not the Court shall withhold its preventive powers simply because there had elapsed a period of some ten or twelve days between the alleged termination of illegal conduct and a hearing predicated upon those preceding acts.

The rule seems to be that if the owner in good faith has abandoned his illegal enterprise with no intention of resuming it or allowing it to be resumed, and that there is no probability of its revival, a permanent injunction should be withheld. It is equally as well established however that if the abatement was merely colorable and was used as a mere pretext to escape the consequences of the previous criminal course, the defense of voluntary abatement should not prevail. Black v. State, supra. See also State ex rel. v. Guardian Realty Co. et al., 237 Ala., 201, 186 So., 168, 121 A. L. R., 634. It was held in the latter case that the alleged abandonment of a line of conduct that constituted a nuisance done for the purpose of con-

vincing the Court that the nuisance had been voluntarily abated, will not render the questions presented by the petition moot, for the reason that the Court might see that it was an effort to avoid the injunction and render the efforts of the State in bringing the action futile. Manifestly these considerations were in the mind of the learned judge who tried this case below. The fact that he made the injunction permanent is very persuasive with us that he believed that the permanence of the injunction was advisable as the most effective means of preventing a recurrence of the conduct which he had denounced as a public nuisance. We frankly state however that if there had been no other charge in the petition than that of the illegal sale of liquor, the point so earnestly and ably argued by counsel upon this question would have given us greater pause.

In the fourth assignment complaint is made that the Court erroneously found that Grace Hotel had been conducted and maintained as a bawdy or assignation house in such manner as to constitute a nuisance. We shall not recite the details of the disgusting condition and situation revealed on the morning of the 7th day of January, 1940. That the Hotel was at that time a den of vice and the seat of immoral and adulterous conduct is shown beyond a reasonable doubt. Not only were two white women discovered in that negro hotel and in a room or rooms with negro men—one of the white women being undressed and in a room with a negro perfectly naked —but there were at least four or five unmarried couples of colored people registered and occupying rooms in the hotel and evidently there for immoral purposes, some of the men and women having been there for weeks. That this shameful conduct had been going on for some time previous to January 7, 1940, was unquestionably shown; that Bradley, the boss, was aware of this illicit conduct is shown with equal conclusiveness; that he was cognizant of the fact that white women were there for cohabitation with negroes cannot be disputed, for the reason that he was one of the participants in that odious conduct. It is admitted by Moore that he let one of the white women, if not both of them, into the hotel on the previous night. Of course he knew that those women were there for the detestable purpose of submitting themselves to the embraces of members of the colored race. We also conclude that these two employees were aware of and connived at the occupancy of rooms by colored men and women who were not married, and we are of the opinion that this was not merely one incident or something that just happened, but that for sometime the hotel had been converted into a meeting place for lewdly inclined men and women. We unhesitatingly state that his Honor, the trial judge, was warranted in finding that this hotel was a place in which assignations and meetings for adulterous purposes were carried on, and that the conduct was such as to require a holding that the hotel was a public nuisance because of this species of conduct, as well as a place for the dispensing of liquor.

It is undoubtedly true that a place does not become a nuisance in general by the transpiring thereon of one criminal act. Dunnaway v. State, 17 Tenn. (9 Yerg.), 350. A sufficing answer is that more than one illegal sale of liquor took place in the Hotel, and that many illegal sexual relations also occurred within the walls. But, as pointed out by the learned Assistant Attorney General, one act may be of such a nature as to reveal the true character of a place, and to warrant therefrom the inference that other similar acts had happened. United States v. Eilert Brewing & Beverage Co. (D. C.), 278 F., 659; Lewinsohn v. United States, 7 Cir., 278 F., 421; United States v. Reisenweber, 2 Cir., 288 F., 520; Cornelius, Search and Seizure (2 Ed.), page 726. We are constrained to overrule this fourth assignment of error.

In the fifth assignment complaint is made that his Honor had made permanent the injunction restraining the defendants from' suffering or maintaining upon the premises any assignation or bawdy house. The reasoning adopted by us in treating assignment number three is pertinent here.

Complaint is made in the sixth assignment that the Court erroneously taxed the receiver's fees and other costs against defendants. There is no merit in this assignment.

It is finally urged, and with great ability, that the Court having found that Grace and Bill James had no knowledge of this immoral conduct and not conniving at it, could not be held responsible therefor, nor their property impounded or the use of it restrained through the instrumentality of a permanent injunction. The Chancellor did find as a fact that these appellants were not aware of this immoral conduct upon the part of their employees, and we shall for the purposes of this cause assume that to be true; but it is difficult to close our eyes to the well established rule that the owner of premises is presumed to be aware of everything of moment transpiring upon his property; and especially is there a presumption that the owner of property has knowledge of any unlawful uses to which it is put when those uses have been long continued.

It was well stated by the Supreme Court of Alabama in the case of State v. Guardian Realty Company, supra, that the owner was under obligation to keep his premises from becoming a place where unlawful occupants may be carried on.

After most thoughtful consideration of the proposition and an examination of many authorities, we have reached the conclusion that a nuisance such as is denounced by Code, section 9324, may be abated although the owner may not have at any time been aware of the unlawful uses to which his property has been put. Virtually all the authorities in the Union bearing upon this proposition are cited and commented upon in the case of State, etc., v. Guardian Realty Company, supra, and in a note in 121 A. L. R., page 642. The Su-

preme Court of Alabama in that case was dealing with the series of statutes similar to our own, when it reached the conclusion that the petition to abate a nuisance may be upheld although the owner was not aware that any unlawful practices were carried on upon his premises. It seems to us that this is the clear inference to be drawn from the case of State v. Persica, 130 Tenn., 48, 168 S. W., 1056. See also note in 63 A. L. R., page 702.

It has often been held that a nuisance may be abated by an action against a tenant without making the landlord a party. See Gaskins v. People of Colorado, 84 Colo., 582, 272 P., 662, 63 L. R. A., pages 695, 702.

 That such actions are both in rem and in personam is clearly foreshadowed in our own case of The Pastime v. State, 138 Tenn., 315, 197 S. W., 1089. And it will be recalled that this is the holding of the Alabama court in State v. Guardian Realty Co., supra. There is nothing peculiar or unjust in holding the landlord responsible for that which his servant or custodian does upon the premises committed to the care of the servant. It is but the application of the maxim that he who does anything by another does it by himself. A distinction may be drawn between cases where the landlord has leased his property to a tenant for a definite term, and cases wherein the owner retains possession and control through the agency of an employee.

 Able counsel present to us with great force the contention that the evidence overwhelmingly shows that Hotel Grace bore and does bear in this community a splendid reputation. This seems to be so. But this, while not to be overlooked, is not the controlling factor. The Code sections under consideration are explicit in their declaration that the maintaining of a house or place for illicit relations between the sexes is a nuisance. It has no provision as respects the length of time such conduct must be carried on to constitute a nuisance, nor is there any suggestion that the conduct must become notorious as a condition precedent to the issuance of an injunction. Law makers have succinctly stated that any place where such conduct is carried on is a nuisance which may be abated by the strong arm of the law. It will be recalled that the Code sections under consideration include a provision that general reputation as to the bad character of the place may be introduced, seemingly excluding evidence of good reputation. A place may be regarded by the community as a house of purity and cleanliness when in fact it may be a den of iniquity. This brings up the old aphorism that character is what a man really is—reputation is that which the public thinks a man is. While not entirely disregarding the evidence of respectability of the place, we are constrained to rule that the revelations were such as to point to the fact that the Hotel had become a rendezvous for lewd persons, and that it sank so low as to become the resort of white

women who had become so degraded as to run counter to that all-prevailing disgust and overwhelming condemnation of sexual union of white and colored people.

The evidence regarding the repeated efforts of appellants to prevent illicit cohabitation in this Hotel presents a splendid front, but it indicates that evil minded persons were constantly appearing and seeking admission to the rooms of the Hotel for the carrying on of their meretricious relations. We are satisfied that the place had become a resort of vice and that the effort of the City to prohibit its continuance was justified by developments, and that this effort should not be paralyzed and rendered nugatory by allowing the appellants to escape entirely the consequences attendant upon such conduct. The learned trial Judge was very careful to so limit his injunctive orders so as not to interfere with the legitimate hotel business; he merely restrained the carrying on of unlawful enterprizes upon the premises. That the name of the Hotel has already been besmirched is a fact which cannot be recalled. Appellants suffer no financial loss or public esteem through the continuance of the injunction. It is for these reasons we do not believe that the relief sought by this proceeding should be withheld.

We shall not refrain from observing that neither Bradley nor John Moore, although answering the bill and joining with appellants in their endeavor to refute the charges, took the witness stand, notwithstanding the overwhelming testimony as to their reprehensibility. It may be said that they are no longer under the control of appellants and that no prejudicial inference should be drawn from the non-appearance of these servants as witnesses. Our response to this counterargument is that the inference is that they are still friendly with appellants and could have been produced as witnesses.

The decree of the Criminal Court of Davidson County is in all respects affirmed and a decree to this effect will be drawn accordingly. The costs of the cause will be taxed to appellants and the sureties on their appeal bond.

Crownover and Felts, JJ., concur.